IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ELAINE BARLEY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FOX CHASE CANCER CENTER | : | NO. 13-6269 |

MEMORANDUM

Dalzell, J.                                                    September 3, 2014

Before us are cross-motions for summary judgment arising from Elaine Barley's

("Barley") termination during her ninety-day orientation period in the histology lab at Fox Chase

Cancer Center ("Fox Chase").  Barley sued Fox Chase for failing to (a) provide her with a

reasonable accommodation for her asthma and (b) engage in an interactive process regarding her

need for accommodation, in violation of the Americans with Disabilities Act ("ADA") and

Pennsylvania Human Relations Act ("PHRA").

For the reasons articulated at length below, we will deny Barley's motion for summary

judgment and will grant Fox Chase's motion for summary judgment.

I.    **Factual Background**

The agreed-upon facts are scant.[1]  In February of 2012 Fox Chase hired Barley as a clerk

in its histology laboratory, subject to a ninety-day so-called orientation period during which Fox

Chase would evaluate her ability to carry out her job duties.  Barley MSJ, Ex. R at 49 and Ex. H.

Barley was an experienced administrative assistant who had worked in hospitals and other

healthcare settings, but had not worked in a laboratory.  Id., Ex. G.  Before her start date, Barley

---

[1] In spite of our July 9, 2014 Order that the parties agree to a record, they conspicuously failed to
provide a statement of uncontested facts.

submitted to a required physical exam on February 9 or 10, 2012, at which time Barley stated that she had asthma and managed it with medications.  Id., Ex. D, at 60:23-61:8; see also Ex. J at 2 and 3.  Barley's start date was delayed by a week -- to February 27, 2012 -- because she was hospitalized for asthma.  Id., Ex. K at 1 and Ex. R at 58.  On March 30 she complained about the chemical odors in the lab to a nurse in Fox Chase's Employee Health Department, who also observed that Barley "suffers from chronic asthma and has trouble breathing."  Fox Chase MSJ, Ex. P.  On April 9 Barley returned to Employee Health complaining of shortness of breath and was advised to go home; another hospitalization for asthma followed.  Id.  On April 20 Barley returned to work with a prescription from her doctor stating (without further elaboration) that she "may return to work full duty 4/23/12 with mask."  Id., Ex. O.  On May 23, 2012, before the conclusion of the ninety-day orientation period, Fox Chase terminated Barley.  Id., Ex. T.

The parties disagree about Barley's performance during her brief employment, the extent to which Fox Chase accommodated her asthma, and the circumstances of her termination.

Barley's duties as an accession clerk included (1) verifying that all specimens received into the grossing -- that is, for an initial pathology exam by the naked eye -- met criteria; (2) recording time and date of specimen receipt; (3) accessioning specimens into the lab's information system by assigning each a unique tracking number; (4) ensuring that the proper number of blocks and slides were made from each specimen; (5) providing or obtaining proper information for each specimen; (6) maintaining the "doctor dictionary"; (7) maintaining accurate records; (8) checking supply inventories and picking up supplies from the storeroom; (9) picking up specimens when requested; (10) cleaning glassware and other surfaces; and (11) assisting with slide retrieval.[2]  Barley MSJ at Ex. F.

---

[2] The job description lists eleven duties but erroneously denotes the final one as number 12.

Barley contended in her deposition that her supervisor, Denise Green, trained her for a single day during which Green was constantly interrupted, id. at Ex. R, 80:17-81:13.  Thereafter, Barley stated, she "went live," id. at 80:24-25, and was urged to seek help from the pathologist assistants ("PA") or Green.  Id. at 83:5-24.  Calling the training "insufficient," id. at 82:21, Barley said she was never trained or shown how to do a number of the duties specified for her job.  Id. at 74:18-19; 77:3-4, 8; 78:16, 23-24; 79:4, 7-10.  She testified that she satisfactorily completed duties for which she had been trained with a minimum of mistakes and contested the defendant's conclusions otherwise.  Id., e.g., at 97, 107-108.

Barley's supervisor and the PAs in the lab present a rather different picture.  Green maintained a log of Barley's duties, documenting when these were explained and whether Barley was performing under supervision or without help.  Fox Chase MSJ, Ex. H.  The notes reflect that Barley accomplished the first three duties working with the PAs.  Id.  But Green noted on April 4, 2012 that Barley "was having a hard time and she did not understand the process" of ensuring the quantity of blocks and slides prepared to expedite the PA's initial specimen review, or grossing process.  Id.  By the date of her termination, Barley had still not performed several other duties or "was not ready."  Id.  In her deposition, Green stated that Barley's predecessor and successor had each required two to three days' training.  Barley MSJ, Ex. B at 172:3-5 and 173:22-24.  As to Barley, Green testified that she had required more than a week, id. at 172:8, and was "struggling" to complete jobs, id. at 132:20.   Jennifer Rowland, one of two PAs in the histology lab, testified that Barley began making errors in the second week.  Id., Ex. P at 32:5.  Romy Auguste, the other PA, showed Barley how to accomplish assigned tasks.  He stated, "The only problem I had was if I show her something at 10:00 in the morning, by lunchtime she would forget it. . . .  She would go back and do it the wrong way again. . . .  [F]or some reason, she

would not get, she could not get it.  I have no idea why."  Fox Chase MSJ, Ex. J at 40:24-41:10.
Maryanne Tapley, the Administrative Manager in Pathology to whom Green reported, stated that
she and others showed Barley the billing aspect of her duties and "[s]he seemed to be very
overwhelmed by it."  Barley MSJ, Ex. E at 90:4.

     Barley disputes Tapley's, Green's and her co-workers' conclusions that she was having
difficulty mastering her responsibilities and making many mistakes.  See id., Ex. R.

     The parties also disagree about the extent to which Fox Chase accommodated Barley's
needs in response to her asthma -- by considering her for another position or offering her masks
while she worked in the histology lab.

     During the ninety-day trial period, the possibility arose of transferring Barley to another
Fox Chase position for which she appeared suitable.  On March 30, Lorraine Dagostino, the
Employee Health nurse who documented Barley's chronic asthma, also observed in writing:
"Manager is trying to arrange with H.R. -- a change of position -- transcription.  Employee will
physically move to another area in dept. away from chemical odors."  Id., Ex. L.  Barley testified
that Tapley told her of the transcription job because she knew Barley had trouble breathing in the
lab. Id., Ex. R at 121:2-21.  Tapley believed Barley would be well-suited for that job because
she had previously been a pathology transcriptionist.  Id., Ex. E at 158:5-6.  To try for the job,
Barley took a test that involved transcribing dictation of surgical pathology, id., at 143-146, and,
despite not seeing the results, believed she had performed well.  Id., Ex. R at 126-128.  Her
supervisors at Fox Chase concluded otherwise as the test results revealed seventeen errors.  Id.,
Ex. E at 153:3-4 and 159:16-17.  Tapley showed the results to three pathologists with whom
Barley would have worked, and was informed that the "amount of errors was not acceptable."
Fox Chase MSJ, Ex. L at 6.

Barley contends she was never informed of the test results and that the error-riddled test shown to her during her deposition was not hers.   Barley MSJ, Ex. R at 139:10-17.

The parties also disagree about Fox Chase's response to Barley's asthma.  Barley returned to work after her second hospitalization on April 20, 2012, with the doctor's note requiring her to wear a mask.  Barley testified that she was given a paper mask instead of the respirator mask that she maintains her doctor specified.  Id., Ex. R at 154:18-156:25.  She stated she had difficulty breathing through the paper mask and never received any other type of mask. Id. at 167-168, 179.  She testified that she gave the doctor's note to Tapley who "told [Barley] it was not her problem.  She hollered and yelled at [Barley].  She threw her hands up in the air and said, 'I don't have time for this. This is not my problem.' "  Id. at 162:2-5.  Barley also testified that Tapley said she had spoken with Barley's doctor.  Id. at 177.  Barley said her doctor told her, "I spoke to your supervisor and I let her know what type of mask you needed," id. at 178, by which Barley stated he meant a respirator mask.  Id.  Barley also stated that she showed the note to her supervisor, Green, and her co-worker Auguste, both of whom leafed through a catalogue with her to find what Barley identified as an appropriate mask.  Id. at 162:20-165:9.  The appropriate mask she sought was never ordered, Barley contended.  Id. at 165.  On May 15, 2012, Barley left a note for Dagostino in Employee Health, stating:

> It has been required by my physician that I wear a mask at work.  I have made several attempts to get the correct mask.  To date, I have not.
> The paper mask I have been given does not allow me to breath properly, and takes away my oxygen.  I have asked about a respirator mask, which will allow me to breathe.  I have talked to Maryann Tapley[,] Administrative Director[,] on numerous occasions, she asked me to speak with you.
> To date, (after approximately 3 months), I have gotten no response or help regarding my medical situation.  Please let me know who can help me.

Id., Ex. M.  Dagostino acknowledged receipt of the note.  Id., Ex. N.

Again, the Fox Chase perspective differs from Barley's in every respect.  Green's supervisor Tapley disputes Barley's account of their interaction.  She testified that, upon Barley's return, she contacted Barley's doctor for additional information but "he could not give me any detail as to what type of mask she should be wearing."  Id. at Ex. E, 74:18-23.  She stated that she told Employee Health to provide the conical mask for which Barley was fitted.  Id. at 76.  Thereafter, according to Tapley, Barley would complain that the mask was "cutting off her air" and "generally have it around her neck," despite Tapley's frequent admonitions to wear it on the job.  Id. at 77:7-13.  Tapley also stated the conical mask replaced Barley's initial paper mask and that Barley was also given a respirator mask but complained she could not breathe while wearing it.  Id. at 80.

Dagostino, the nurse in Employee Health, stated it was her responsibility to determine what kind of mask could accommodate Barley's needs, id., Ex. D at 35:3-10, but also explained that Tapley's role in the interactive process was "[t]o figure out how to accommodate [Barley] so that she would be able to do her job."  Id. at 26:8-13.  Dagostino's logs show that she was aware on April 20 that Barley's physician required her to wear a mask.  Fox Chase MSJ, Ex. P.  When Barley next visited Employee Health on May 3, the log reflects that Dagostino gave Barley a N95 conical face mask and showed her how to wear it.  Id.  The Fox Chase employees, separately, offered testimony that Barley persistently refused to wear the mask despite repeated urgings to do so.  On May 10, 2012, Dagostino observed that "[Barley] continues to work without a mask."  Id. at 2.  Barley's supervisor, Green, testified that Barley wore the mask Fox Chase provided around her neck, not on her face.  Barley MSJ, Ex. B at 145:21-22 and 148:9-10.  Green frequently told Barley she had to wear the mask, but Barley complained repeatedly about

it:  "She always said I just don't want to wear it.  She always had the mask around her neck."  Id.
at 150:20-22.  Asked whether she reminded Barley to wear the mask, Green answered, "All the
time."  Id. at 151:1.

Similarly, Barley's lab coworker Rowland instructed her to wear the mask, but Barley
"said it was too big and bulky."  Id., Ex. P at 28:7.  Rowland testified, "I would see it honestly
dangling from her ear.  It would just be hanging there because she said it was restrictive."  Id. at
23:4-6.  Rowland also testified that she suggested Barley use the lab's respirator mask, accessible
to all three lab employees, when she returned from her second hospitalization.  Id. at 23:16-24:5.
Barley tried it on but also found it too big and bulky and opted not to wear it.  Id. at 24:7-14.

Finally, the parties disagree about the circumstances of Barley's termination.  Barley's
supervisor, Green, asked her superior, Tapley, to extend the probation period for two weeks
because of Barley's hospitalization, but Tapley denied her request.  Id., Ex. B at 230.  Tapley
testified she made the decision not to extend the probation period "[b]ased upon the facts that
Denise [Green] had provided [Tapley] of the issues that were going on with [Barley] not being
able to complete A through Z, the PAs often being interrupted, stepping away from the grossing
to help her."  Id., Ex. E at 117:19-23.  She further testified that Barley was not terminated
because of her repeated failure to wear the mask, id. at 208:10-12, but only because of her poor
performance, id. at 205:20-23.  Barley's May 23, 2012 Notice of Termination from Tapley states
that Green met with Barley to discuss her errors, which "continued causing delays and
interruptions to the workflow within the histology lab."  Fox Chase MSJ, Ex. T.  In the Notice,
Tapley detailed meetings between Barley and Green on March 5, 7 and 19; April 5 and 30; and
May 9 and 21, 2012, to discuss errors or Barley's failure to improve her speed and accuracy.  Id.

Barley testified that her asthma did not affect her ability to complete her duties, except to

the extent that she was exposed to certain chemicals in which specimens were sent to the lab. Barley MSJ, Ex. R at 70.  As she has from the inception of this case, Barley maintained that her work was satisfactory and she was terminated because she has asthma and had been out sick numerous times.  Id., at 200.

The parties also dispute whether and/or when Green advised Barley as a friend that she would be terminated some weeks before the actual event.  See id. at 194-195;  see also Fox Chase MSJ, Ex. D. at 58-59.

## II.   Legal Standard

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A party moving for summary judgment bears the burden of proving no genuine issue of material fact exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986).  To that end, the movant must inform the district court of the basis for its argument by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   Where the movant is the defendant or the party that does not have the burden of proof on the underlying claim, it "has no obligation to produce evidence negating its opponent's case," National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992).  The movant need only point to the lack of evidence supporting the non-movant's claim.  Id.

When both parties move for summary judgment, our task is no different.  As our Court of Appeals teaches,

> Cross-motions are no more than a claim by each side that it alone

> is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.

Rains v. Cascade Industries, Inc., 402 F.2d 241, 245 (3d Cir. 1968).  Cross-motions must be considered separately and should not be interpreted necessarily to mean that judgment should be entered on either one of them.  Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that he is entitled to a judgment as a matter of law.  10A Charles Alan Wright and Arthur R. Miller, Federal Practice & Procedure, §2720 (3d ed. 2014).  As in any summary judgment motion, the determination whether a genuine issue concerning a material fact exists is itself a question of law that the Court must decide.  It does not depend upon what either or both of the parties may have thought about the matter.  A party moving for summary judgment concedes the absence of a factual issue and the truth of the nonmoving party's allegations only for purposes of his own motion.  Id.  As Wright and Miller observe, "It follows that the legal theories the movant advances in support of a Rule 56 motion and the assertion that there is no issue of material fact may not be used against the movant when the court rules on his adversary's motion."  Id.

It is well-established that Rule 56 requires the nonmoving party "to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Celotex, 477 U.S. at 324; see also Fed. R. Civ. P. 56(c).  The reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d

535, 538 (3d Cir. 2006).   A factual dispute is "genuine" if it turns on "evidence on which the jury could reasonably find for the plaintiff."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Id. at 248.  However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].' "  S.H. ex rel. Durrell v. Lower Merion School Dist., 729 F.3d 248, 256 (3d Cir. 2013) (quoting Anderson, 477 U.S. at 252) (internal citation omitted).

Because we consider cross-motions before us, "[t] he fact that one party fails to satisfy that burden on his own Rule 56 motion does not automatically indicate that the opposing party has satisfied his burden and should be granted summary judgment on the other motion."  10A Wright & Miller at §2720.  Both motions must be denied if we find there is a genuine issue of material fact, but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court may render judgment.  Id.

If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, the moving party is entitled to judgment as a matter of law.  See Celotex, 477 U.S. at 322.  Specifically, Rule 56(e) provides in relevant part that "[i]f a party fails to properly . . . address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials--including the facts considered undisputed-- show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

## III.   Discussion

### A.   Barley's Motion for Summary Judgment

We turn first to Barley's motion for summary judgment.  For the three reasons discussed

below, Fox Chase has raised genuine issues of material fact.  Accordingly, we will not grant Barley's motion for summary judgment.

The Supreme Court has held that the primary purpose of the ADA is "to diminish or to eliminate the stereotypical thought processes, the thoughtless actions, and the hostile reactions that far too often bar those with disabilities from participating fully in the Nation's life, including the workplace." U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401 (2002).  To make out a prima facie case of discrimination under the ADA or PHRA, a plaintiff must establish that she (1) has a disability, (2) is a qualified individual, and (3) has suffered an adverse employment action because of that disability.  Gaul v. Lucent Technologies Inc., 134 F.3d 576, 580 (3d Cir. 1998).

Barley contends that her asthma is a disability under the law and that she was qualified for the position at Fox Chase.  Barley MSJ at 16-20.  She seeks judgment in her favor because, she argues, Fox Chase did not accommodate her disability by failing to engage in a legally mandated "interactive process" to assist her after she requested an accommodation, though a reasonable accommodation was possible.  Id. at 15.  She argues she should prevail because she can meet the four-part test established in Taylor v. Phoenixville School Dist., 184 F.3d 296 (3d Cir. 1999), by showing that (1) Fox Chase knew of her disability; (2) she requested an accommodation for her disability; (3) Fox Chase did not make a good faith effort to help her with an accommodation; and (4) Barley could have been reasonably accommodated but for Fox Chase's lack of good faith.  See id. at 319-20.  She states that Fox Chase knew of her asthma and that she clearly requested a specific accommodation in her May 15, 2012 letter to Dagostino -- which went unanswered.  Barley MSJ at 22-25.  Because Fox Chase knew she desired an accommodation but took no steps to respond, she argues, it failed to make a good faith effort to accommodate her when it could easily have done so.  Id. at 25-27.

11

Fox Chase counters with three arguments.  First, it contends that Barley's failure-to-accommodate claim is judicially estopped because she made contemporaneous contradictory statements to the Social Security Administration ("SSA") in a successful effort to obtain disability benefits.  See Mem. in Opp. at 3; see also Fox Chase MSJ at 13-16 (which Fox Chase incorporates by reference in its response).  Second, Fox Chase argues that there are genuine issues of material fact as to whether Barley was qualified given her many errors entering data -- which disrupted the lab's work -- and her failure to perform well on the transcription test.  See Mem. in Opp. at 6-7.  Therefore, Fox Chase contends, Barley is not entitled to summary judgment because there are genuine issues of material fact as to whether she satisfied the requisite skill or could perform the essential functions for the position.  Id.  Finally, Fox Chase argues that a genuine issue of material fact exists as to whether the parties engaged in the interactive process because Barley ignores the many steps Fox Chase took to accommodate her by, inter alia, contacting her doctor, offering her several kinds of masks, and allowing her to test for the transcription job.  Id. at 8-9.  By the time Barley delivered the May 15, 2012 letter to Dagostino, Fox Chase argues, Barley's supervisors knew she had been provided three different kinds of masks and that Tapley had reached out to her doctors -- it claims it had no obligation to engage any further in the interactive process knowing statements in the letter were false.  Id. at 10.

Barley replies that her filing for disability benefits is irrelevant because there was no conflict between her ADA claims and her disability benefit claims.  Reply at 3.  She further counters that the errors Fox Chase cites were "immaterial" and only concerned anyone at Fox Chase after Barley was hospitalized.  Id. at 5.  Barley insists there are no genuine issues of material facts that show she is a qualified individual who could perform with a reasonable

12

accommodation.  Id. at 5-6.  Finally, she responds that Fox Chase's actions, before her May 15 letter formally requesting an accommodation, are immaterial because Fox Chase failed to engage in the interactive process thereafter.  Id. at 6-7.

As stated above, Barley bears the burden of establishing that no genuine issue of material fact exists and that she is entitled to summary judgment as a matter of law and Fox Chase bears the burden of going beyond the pleadings to identify specific facts to show there is a genuine issue for trial.

### 1.      Judicial Estoppel

Judicial estoppel is a judge-made doctrine that "seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding."  Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d Cir. 1996).  In general, the doctrine is designed to prevent litigants from "playing fast and loose with the courts."  Id. (internal quotation omitted).  The basic principle is that "[a]bsent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."  18B Charles A. Wright and Arthur R. Miller, Federal Practice & Procedure, § 4477 (2d ed. 2014).

Fox Chase argues that Barley should be estopped from making an ADA claim because she advised the SSA that her employment at Fox Chase ended on April 27, 2012 -- several weeks before her actual termination date -- as a result of disabilities, including severe asthma.  Mem. in Opp. at 3.  Fox Chase contends that Barley's arguments to the SSA that her asthma could not be medically controlled and caused hospitalizations after her Fox Chase employment show that a mask would not have enabled her to perform her duties while at Fox Chase.  Fox Chase MSJ at 14-15.  Fox Chase also argues that Barley must reconcile her statements to the SSA (claiming

total disability and inability to work under any circumstance) with her ADA claims, even though the SSA's eligibility determination does not take reasonable accommodations into account.  Id. at 15-16.

In her reply, Barley incorporates by reference her response to Fox Chase's motion for summary judgment, in which she countered that her application for Social Security disability benefits is not inconsistent with her ADA claims because each claim has a different standard, that is, the ADA requires a plaintiff to show she can perform with a reasonable accommodation and the SSA does not consider reasonable accommodations, Mem. in Opp. at 6-7.  Further, Barley contends that her Fox Chase claim arises from her difficulty performing within the lab's toxic chemical environment, id. at 9, whereas the SSA ultimately awarded her disability based on the number and severity of her asthma attacks.  Id. at 10.  She argues that she worked as a contract employee and received unemployment compensation after she left Fox Chase -- while her disability benefits were pending.[3]  Id.  The Administrative Law Judge ("ALJ") found Barley disabled for the purposes of the SSA, but, she avers, this conclusion does not touch on her ability to perform essential job functions with reasonable accommodations.  Id. at 11.

The SSA record shows that Barley testified she was terminated from the histology lab at a time when she was in and out of the hospital with asthma and "working around a lot of chemicals" which "triggered [her] asthma badly."  Fox Chase Reply Br., Ex. C at 5.  The record also shows she stated that she was "terminated for being sick," id. at 6.  Although she was originally denied disability benefits, she hired counsel and ultimately prevailed in her claim.  See Fox Chase MSJ, Ex. R.  On September 23, 2013, prior to the commencement of this lawsuit, the

---

[3] Barley did not disclose that she held brief jobs as a contract employee to the SSA.  See Barley Resp. Ex. S at SSA000657 ("The claimant testified that she stopped working in April 2012

ALJ issued a fully favorable decision, determining Barley had been disabled since April 27, 2012 under Sections 216(j), 223(d) and 1614(a)(3)(A) of the Social Security Act and awarding her disability benefits as of that date.  Fox Chase MSJ at 10.  He found, inter alia, that Barley had stopped working in April of 2012 and had been hospitalized for breathing difficulties six times in the following twelve-month period.  Id., Ex. R (see SSA000657-658).

Our Court of Appeals has held that judicial estopped may only be imposed if (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one asserted in a prior proceeding; (2) the party changed his or her position in bad faith, that is, "in a culpable manner threatening to the court's authority or integrity"; and (3) the use of judicial estoppel is "tailored to address the affront to the court's authority or integrity."  Montrose Medical Group Participating Savings Plan v. Bulger, 243 F.3d 773, 777-78 (3d Cir. 2001).  Our Court of Appeals explained that we may not invoke this doctrine unless "no sanction established by the Federal Rules or a pertinent statute is up to the task of remedying the damage done by a litigant's malfeasance" or "the sanction of judicial estoppel is tailored to address the harm identified."  Id. at 784 (internal citation and alterations omitted).  Judicial estoppel "may not be used to punish litigants for how they treat other litigants or third parties; its only legitimate purpose is to remedy an affront to the court's integrity."  Id. at 785 (emphasis in original).

In Cleveland v. Policy Management Systems Corp., 526 U.S. 795 (1999), the Supreme Court considered the legal effect on an ADA suit of the application for, or receipt of, disability benefits.  The Court found that "[a]n SSA representation of total disability differs from a purely factual statement in that it often implies a context-related legal conclusion, namely, 'I am disabled for purposes of the Social Security Act.' ".  Id. at 802.  The Court found that the SSA

---

(Testimony).  After the second quarter of 2012 the claimant has received unemployment benefits

sometimes grants disability benefits to individuals who not only can work but are working, id. at 805, in part because the SSA does not take the possibility of "reasonable accommodation" into account, but the ADA does, id. at 803.

Cleveland also imposes an additional requirement on our judicial estoppel analysis.  See Detz v. Greiner Industries, Inc., 346 F.3d 109, 116 (3d Cir. 2003).  An ADA "plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case -- at least if she does not offer a sufficient explanation."  Cleveland, 526 U.S. at 806.  Thus, a plaintiff who has also applied for disability benefits "cannot simply ignore the apparent contradiction that arises out of the earlier . . . disability claim" but must "proffer a sufficient explanation" to defeat a defendant's motion for summary judgment.  Id.  The "explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement [to the SSA], the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.' "  Id. at 807.  Since judicial estoppel is raised here in opposition to a motion for summary judgment, Fox Chase as the nonmoving defendant need only show there is no genuine issue for trial.

Barley urges that we adopt our Court of Appeals's reasoning in Turner v. Hershey Chocolate USA, 440 F.3d 604 (3d Cir. 2006).  There, a former employee who received total disability benefits filed a discrimination claim against her previous employer.  Id. at 607.  Our Court of Appeals reversed the district court's grant of summary judgment to the employer on the basis of judicial estoppel.  Judge Rendell wrote that the claimant's statement to the SSA that her pain impeded her ability to do her occupational duties "is neither a categorical statement of total

---

but not wages earned from work.").

inability to perform her job function nor takes into account [the claimant]'s entitlement to reasonable accommodation," id. at 608, and did not judicially estop her from asserting her ADA claim.  "Because these statements did not state categorically that Turner could not work at all or take into account Turner's entitlement to reasonable accommodation, we see no inconsistency between these statements and her current claim."  Id.

Fox Chase argues that Barley has failed to explain the apparent inconsistency between her claim of total disability to the SSA and her ADA claims.  During her deposition, Barley answered Fox Chase counsel's questions concerning her SSA testimony thus:

> Q:    And so you alleged that -- what you told Social Security Administration and what you're receiving benefits for is that you're totally disabled, yes?
> A:    Yes.
> Q:    And when I say "totally disabled," that means you're unable to work?
> A:    Yes.
> Q:    Under any sort of circumstances, correct?
> A:    Yes.
> Q:    Without any sort of accommodation, yes?
> A:    I believe so.
> Q:    When you say you believe so, is that a figure of spe[ech], or is that accurate?
> A:    That's accurate.
> Q:    Okay.  And you applied for permanent disability you said on April of 2012, yes?
> A:    Yes.
> Q:    And so, as of April 2012, you were totally disabled. And so, therefore, you were unable to work beyond that point, yes?
> A:    Yes.
> Q:    Okay.  And when you applied to the Social Security Administration, you attested that the information you provided them was accurate, correct?
> A:    Correct.

Fox Chase MSJ, Ex. D, 43:20-44:24.  Fox Chase argues that this interchange demonstrates that Barley was unable to reconcile her statements to the SSA to her claims here.  Reply Br. at 5.

At the very least, Barley's account of her SSA testimony appears to categorically state that she could not work at all, even with reasonable accommodation.  We find that Barley's deposition raises a genuine issue of material fact as to whether a reasonable juror could find that

17

she had failed to proffer a sufficient explanation for the discrepancy between her SSA statements and her ADA claim.  Consequently, we will not grant Barley's motion for summary judgment.

### 2.    Whether Barley Was A Qualified Individual

Fox Chase also argues that there is a genuine issue of material fact as to whether Barley was a qualified individual within the meaning of the ADA because of her many errors, her documented difficulty accomplishing certain tasks on her own and her failure to perform well on the transcription test.  The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.  42 U.S.C. § 12111(8).   Our Court of Appeals has held this is a two-part inquiry:  "(1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position."  Buskirk v. Apollo Metals, 307 F.3d 160, 168 (3d Cir. 2002) (quoting 29 C.F.R. § 1630.2(m)).

The record teems with testimony that casts doubt on whether Barley had the requisite skill and other job-related requirements to do her job at Fox Chase.  Her co-worker in the lab testified that he would show her how to do a task in the morning, only to have her forget it by lunchtime.  See Fox Chase MSJ, Ex. J.  Even before her April hospitalization, Barley's supervisor Denise Green documented on April 4, 2012 that Barley "was having a hard time and she did not understand the process" of ensuring the quantity of blocks and slides prepared to expedite the PA's initial specimen review, or the grossing process.  Id., Ex. H.  Green testified that it had taken well over a week to train Barley, compared with her predecessor and successor who required only two to three days' training.   Barley MSJ, Ex. B at 172:3-8 and 173:22-24.  She also noted that Barley was "struggling" to complete jobs, id. at 132:20.   Toward the end of

18

the 90-day period, Green's log of Barley's progress showed that Barley was "not ready" to perform five of her assigned duties.  Fox Chase MSJ, Ex. H.

This evidence, far from being immaterial as Barley would have it, also suffices to raise genuine issues of material fact as to whether Barley was a qualified individual within the meaning of the ADA.

3.     Whether The Parties Engaged In An Interactive Process

Finally, Fox Chase argues there is a genuine issue of material fact concerning Barley's assertion that it breached its duty to engage in the interactive process between her May 15, 2012 letter to Dagostino and May 23, 2012 termination, notwithstanding Fox Chase's multiple earlier efforts to help her.

The ADA provides that an employer discriminates against a qualified individual with a disability when the employer does not make reasonable accommodations.  See 42 U.S.C. § 12112(b)(5)(A).  Our Court of Appeals defines "reasonable accommodation" as including "the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith," Mengine v. Runyon, 114 F.3d 415, 416 (3d Cir. 1997), under what has been termed as a duty to engage in the "interactive process."  Williams v. Phila. Hous. Auth. Police Dept., 380 F.3d 751, 761 (3d Cir. 2004).  An employee can show an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that:  (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.  Id. at 772.  Our Court of Appeals held in Mengine that the process could be flexible and

informal, requiring only the participation of both employer and employee.  See 114 F.3d at 419.

Again, the record demonstrates that Fox Chase was aware of Barley's asthma from the moment she completed her medical exam.  Barley MSJ, Ex. D, at 60:23-61:8; see also Ex. J at 2 and 3.  Although Barley focuses solely on her May 15 letter as the time she sought reasonable accommodations, she clearly sought assistance for her disability when she visited Employee Health on March 30 and nurse Dagostino noted her chronic asthma and difficulty breathing.  Fox Chase MSJ, Ex. P.  That day -- well before Barley's hospitalization -- the nurse's "Report of Concern" also recorded that Barley's "[m]anager is trying to arrange with H.R. -- a change of position -- transcription.  Employee will physically move to another area in dept. away from chemical odors."  Barley MSJ, Ex. L.

Barley returned to work after her hospitalization with a doctor's note stating she "may return to work full duty 4/23/12 with mask."  Fox Chase MSJ Ex. O.  Barley shared her doctor's note with nurse Dagostino, her supervisor Green, Green's supervisor Tapley, and her lab coworkers.  Thereafter, Fox Chase's evidence shows, Barley was offered a paper mask, id., Ex. R at 154:18-156:25, a heavier conical mask for which the nurse fitted her, id., Ex. E, 74:18-23, and a respirator mask accessible to all three employees in the lab, id., Ex. P at 23:16-24:5.[4]

On this record, Fox Chase has raised a genuine issue of material fact concerning Barley's assertion that it did not make a good faith effort to assist her in seeking accommodations and that she could have been reasonably accommodated.

Viewing the facts in the light most favorable to Fox Chase and drawing all reasonable inferences in its favor, we find Barley has failed to show she is entitled to judgment as a matter

---

[4] Although it is immaterial to Fox Chase's participation in the interactive process, the extensive testimony concerning Barley's refusal to wear any of these masks bears noting.

of law.  Accordingly, we will deny Barley's motion for summary judgment.

      B.     <u>Fox Chase's Motion For Summary Judgment</u>

We turn now to Fox Chase's motion for summary judgment.

Fox Chase makes three arguments in support of its motion.  First, it contends that Barley is judicially estopped from pursuing her ADA claims for discrimination and failure to accommodate because she filed for Social Security disability benefits claiming to be totally disabled while still employed at Fox Chase.  Mem. of Law at 8.  Fox Chase contends that Barley cannot reconcile her contradictory statements before the SSA with her claims in this suit.  <u>Id.</u> at 15-16.

Second, Fox Chase urges us to find that Barley cannot establish a <u>prima</u> <u>facie</u> claim of retaliation.  To do so, Barley must show (1) she is engaged in a protected activity; (2) Fox Chase took adverse employment action after or at the same time as her protected activity; and (3) there is a causal connection between the protected activity and the adverse action.  <u>Id.</u> at 17.  Fox Chase contends that Barley can show neither "temporal proximity" nor the existence of a "pattern of antagonism" to support the requisite causal connection between the animus she claims Tapley displayed and her termination, because Tapley was not the sole decisionmaker either in terminating Barley or denying her the transcription position.  Fox Chase Mem. of Law at 17-18.

Finally, even if Barley could establish a <u>prima</u> <u>facie</u> case of retaliation, Fox Chase argues that she cannot show that the decisions not to transfer her to the transcription position and to terminate her were pretextual.  <u>Id.</u> at 20.  The shift that Barley alleges in Tapley's manner toward her is insufficient as a matter of law to sustain a retaliation claim, Fox Chase contends.  <u>Id.</u>

Fox Chase urges that Barley's state-law claims fail for identical reasons.  <u>Id.</u> at 21.

Barley responds that her application for Social Security disability benefits is not inconsistent with her ADA claims because, as stated above, the ADA claim considers whether a plaintiff can perform with a reasonable accommodation and the SSA ignores reasonable accommodations. Barley Mem. in Opp. at 6-7. Barley urges that we find her application for Social Security disability benefits was not clearly inconsistent with her ADA claims. Id. at 18. Any inconsistencies, she avers, are issues for a jury -- including her assertion that she filed for Social Security disability on the date that Green forewarned her of her pending termination rather than after her termination.[5] Id. at 20.

Barley also contends that she establishes a prima facie case of retaliation because of Tapley's discriminatory animus toward her. Barley MSJ, Ex. R at 207. She points to the temporal proximity of her May 15 letter, which Dagostino forwarded to Tapley, and Tapley's discovery the next day that Barley had filed for Social Security disability benefits before her termination. Mem. in Opp. at 21. She also points to Tapley's internal email also on May 16 about the likelihood that Green informed Barley of her impending dismissal, id. at 21-22, and Fox Chase's post-termination documentation.

Finally, Barley contends that Fox Chase's arguments for terminating her are pretextual because (1) she was hospitalized before and during her orientation period; (2) when she returned from the second hospitalization, Tapley treated her differently and began documenting her work; and (3) even after she was terminated, Tapley sought her medical file. Id. at 23-24. Barley also argues that poor performance is a mere pretext because she was discharged before the conclusion

---

[5] Barley also contends that Fox Chase improperly seeks to impeach Barley's credibility by citing from Barley's testimony at the SSA proceedings. Mem. in Opp. at 15, 17. Barley's contention does little to bolster her argument since both her SSA and deposition testimony were taken under oath.

of the ninety-day probationary period, despite her supervisor's request she be given additional time, and was never given a formal evaluation of her work.  Id. at 24-25.

Taken together, Barley contends she has raised genuine issues of material facts as to whether she was discharged for poor performance.

In its reply, Fox Chase argues that Barley's post-termination work history and receipt of unemployment benefits have no bearing on the contradictory positions before the SSA and in this lawsuit.  Reply at 1-4.  As to her prima facie case, Fox Chase avers that Barley offers no direct evidence of retaliation and its post-termination actions do not constitute retaliation as a matter of law.  Id. at 9.

It is well-established that Fox Chase bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to summary judgment as a matter of law and Barley bears the burden of going beyond the pleadings to identify specific facts showing there are genuine issues for trial.

1. Judicial Estoppel

As stated above, Cleveland puts the burden on a plaintiff seeking to survive a motion for summary judgment to "explain why that [disability benefit] contention is consistent with her ADA claim that she could 'perform the essential functions' of her previous job, at least with 'reasonable accommodation.' ", Cleveland, 526 U.S. at 798.   As the Supreme Court elaborated, "When faced with a plaintiff's previous sworn statement asserting 'total disability' or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of

an ADA claim."[6]  Id. at 807.  In Detz, our Court of Appeals adopted the Seventh Circuit's

analysis, under which a plaintiff

> may not, simply by disavowing a prior claim of total disability,
> perform an about-face and assert that he is a "qualified individual"
> who is capable of working. Rather, ... the plaintiff must proceed
> from the premise that his previous assertion of an inability to work
> was true, or that he in good faith believed it to be true, and he must
> demonstrate that the assertion was nonetheless consistent with his
> ability to perform the essential functions of his job. . . .
> Explanations of the sort Cleveland requires are, in short, contextual
> -- they resolve the seeming discrepancy between a claim of
> disability and a later claim of entitlement to work not by
> contradicting what the plaintiff told the Social Security
> Administration, but by demonstrating that those representations,
> understood in light of the unique focus and requirements of the
> SSA, leave room for the possibility that the plaintiff is able to meet
> the essential demands of the job to which he claims a right under
> the ADA.

346 F.3d at 118 (citing with approval Lee v. City of Salem, Ind., 259 F.3d 667, 674-75 (7th Cir.

2001)).

        Barley states that there is no inherent conflict between her statements to the SSA and her

claims here because her contention that she is totally disabled must be understood within the

context of an SSA application.  Barley Mem. in Opp. at 7.  She contends that her asthma limited

her ability to do the assigned tasks within "the toxic environment of the pathology lab."  Id. at 9.

She observes that the SSA eventually found her eligible for benefits because of the number and

degree of her asthma attacks over a one-year period, which she contends is "a factor which is

---

[6] The necessary elements of Barley's discrimination claim are well-settled (1) the employer
knew about the employee's disability; (2) the employee requested accommodations or assistance
for his or her disability; (3) the employer did not make a good faith effort to assist the employee
in seeking accommodations; and (4) the employee could have been reasonably accommodated
but for the employer's lack of good faith.  Taylor v. Phoenixville School Dist., 184 F.3d 296,
319-20 (3d Cir. 1999) (citations omitted).

wholly irrelevant to the instant ADA claim." Id. at 11; see also Mem. in Opp. Ex. S at SSA000657 (ALJ determining that "this fully favorable decision is predicated on the claimant's severe asthma impairment alone."). She testified that she advised the ALJ that she could have performed her prior position had she been given the proper mask. Id. at 12. She relies on Turner, where our Court of Appeals held that plaintiff's statement categorically said she could not work nor took into account her entitlement to reasonable accommodation, to contend that her claims are not estopped because her "statement of inability to work must be read as lacking the qualifier of reasonable accommodation, which did not apply for the purposes of her [SSA] application." Turner, 440 F.3d at 610.

Fox Chase responds that Barley cannot "point to a single document to prove that she advised the SSA that she was capable of working with a respirator mask." Fox Chase Reply at 5. Instead, it states, Barley told the SSA she is totally disabled and was terminated because she was "in and out of the hospital with asthma," id., Ex. C at 3; see Fox Chase MSJ, Ex. D, 43:20-44:24, quoted above. Fox Chase stresses that Barley told the SSA that her employment had ended in April (and, indeed, she received benefits retroactive to April 27, 2012) when her employment in fact terminated on May 23, 2012. It also contends that, during her second deposition, Barley contradicted her earlier testimony that Green warned her in May of her impending termination by stating that Green did so in April in order to justify to the SSA the claimed April termination date. Fox Chase MSJ at 10-11. Finally, Fox Chase notes that Barley failed to disclose post-termination employment to the SSA, while referring to it in this litigation to substantiate her claim that she could work with a reasonable accommodation of her asthma, Reply Br. at 3, and that she also received unemployment benefits. Id.

Our Court of Appeals has held that "simply averring that the statutory schemes differ is

25

not enough to survive summary judgment in light of <u>Cleveland</u>."  <u>Motley v. New Jersey State Police</u>, 196 F.3d 160, 166 (3d Cir. 1999).  In <u>Motley</u>, an officer who sued because he had been passed over for promotion also pursued disability benefits based on his becoming physically incapable of performing his usual duties.  Our Court of Appeals found that "[n]owhere in his application for the disability pension is there any indication that [the officer] could perform the essential functions of a state trooper, with or without accommodation."  <u>Id.</u>  Because the Court concluded that the plaintiff had failed to bring "additional reasons" for his conflicting answers to its attention, it held that the District Court did not err in finding "there is not sufficient evidence to allow a reasonable juror" to reconcile his two assertions.  <u>Id.</u> at 166-67.

Similarly, in <u>Detz</u>, where the plaintiff pressed an age discrimination claim, our Court of Appeals applied the <u>Cleveland</u> analysis.  Our Court of Appeals found telling (1) the absence of SSA testimony that the plaintiff remained physically able to do his job; (2) his pursuit of disability benefits after an initial denial; (3) his contradictory sworn contentions that he was physically incapable of performing his job (to the SSA) and (4) that he was discharged from a position he was physically capable of performing (to the Court).  <u>Detz</u>, 346 F.3d at 119-20.  "[A] careful reading of the SSA's decision granting Detz [disability] benefits reveals that Detz succeeded in convincing the SSA that his physical limitations actually prevented him from continuing in his previous job, not just that he was impeded in his efforts to find work elsewhere."  <u>Id.</u> at 120.  Calling the plaintiff's disavowal of his SSA testimony "[t]he fatal flaw" in his attempt to reconcile divergent testimony, our Court of Appeals held that the District Court properly rejected his explanations as inadequate because they "constitute[d] an attempt to create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his own previous sworn testimony."  <u>Id.</u> at 121 (internal quotations and alterations omitted).

We find Motley and Detz more to the point of this controversy than Turner.  As in Detz, Barley continued to pursue her disability claims after an initial denial and maintained in sworn testimony that she was physically incapable of performing her job.  Nowhere in Barley's SSA application did she indicate she could perform the essential functions of her Fox Chase job -- indeed, she omitted to report any work done after her Fox Chase stint and stated she "last worked [in] April of 2012."  Fox Chase Reply, Ex. C at 3.  And as in Motley, nowhere in Barley's testimony in the SSA proceeding is there any indication that she testified that she could perform with a reasonable accommodation.  Indeed, we agree with Fox Chase that her testimony of continued post-employment asthma attacks, see Mem. in Opp. at 10, undermines her position here that she could have performed but for the reasonable accommodation that was denied.

Barley's conclusory statements, in her response and her deposition testimony, that she could have performed her prior position had she been given the proper mask, are insufficient to create a genuine issue of material fact.  See Liotta v. Borough of Springdale, 985 F.2d 119, 122 (3d Cir. 1993).  Relying solely on her own deposition testimony in support of her contention, she has failed to present more than a scintilla of evidence on which a jury could reasonably find for her.  On the record before us, we conclude that there is not sufficient evidence to allow a reasonable juror to conclude that -- assuming the truth of, or Barley's good-faith belief in -- her earlier statement to the SSA, she could nonetheless perform the essential functions of her job, with or without reasonable accommodation.  Because Barley cannot reconcile her contradictory claims to the SSA and in this litigation, we will grant Fox Chase's motion for summary judgment on Barleys' claim of discrimination.

2.      Whether Barley Can Establish A Prima Facie Claim Of Retaliation

To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged

in a protected employee activity; (2) the employer took an adverse employment action after or at the same time as the protected activity; and (3) there is a causal link between the protected activity and the adverse action.  See Fasold v. Justice, 409 F.3d 178, 188 (3d Cir.2005).  Our Court of Appeals has held that causation can be shown through temporal proximity between the protected activity and the adverse employment action; an intervening pattern of antagonism; or the evidence taken as a whole.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000); see also Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997).

Barley would have us view her May 15 letter as the protected activity that spurred the adverse action.  She claims that, upon her return from her April hospitalization, Tapley's attitude toward her changed completely:  "She was distant with [Barley].  She was very short with [Barley]."  Barley MSJ, Ex. R at 207:4-5.  Barley as the nonmoving party must go beyond the pleadings and show, from the record, the specific facts that present issues for trial.  Barley has not done so.  She states, without support in the record, that Green told her Tapley intended to terminate her because of her asthma.  Id. at 203:3 and 206:17-21.  She relies on (1) the May 15 letter which Dagostino forwarded to Tapley; (2) Tapley's receipt of information from an H.R. professional that Barley had sought disability benefits while still employed; and (3) an email stating that Tapley believed Green was "filling Elaine [Barley] in on some things that are going on."  Barley Mem. in Opp. at 21-22; see also Ex. Q and R.

But our Court of Appeals has held that "mere temporal proximity" of termination to complaints is insufficient, by itself, to demonstrate the required causal nexus and "[o]nly when the facts are unusually suggestive of retaliatory motive may temporal proximity alone support an inference of causation."  Escanio v. United Parcel Service, 538 Fed. Appx. 195, 200 (3d Cir. 2013) (internal citations omitted and quotation marks).  Barley's insistence on the May 15 - May

28

23 timeframe ignores the weighty evidence of record that, far from retaliating, Fox Chase made continued efforts to accommodate her.  We cannot be so blinkered. There is nothing in the record before us that suggests retaliation, let alone "unusually" so.  Similarly, Barley's argument that Tapley was distant and short with her, when she returned from her hospitalization, is far from a "pattern of antagonism."  See Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997). Instead, the record shows that Tapley's decision not to extend the probation period and to terminate Barley rested on reports she received from Green and the three pathologists to whom she showed the transcription test results.  Green's information, in turn, was supplemented by Barley's lab coworkers' input.  Barley does not allege that her coworkers or her supervisor harbored retaliatory animus toward her.  Yet their reports unanimously conclude that Barley could not perform her required duties.  In short, Tapley did not make her decision in a vacuum.

 Contrary to Barley's assertion that Fox Chase took an adverse action the day she handed in the May 15 letter or thereafter, there is ample evidence to show that many Fox Chase employees repeatedly sought solutions to Barley's breathing problems.  Her coworkers and her supervisor Green offered her a series of masks, nurse Dagostino fitted her for a specific conical mask, and Tapley gave her the opportunity to try out for a different job outside the histology lab. As a matter of law, then, Barley cannot show causation based on the record as a whole.

We agree with Fox Chase that Barley cannot make out a prima facie case of retaliation based upon temporal proximity, a pattern of antagonism or on the record as a whole. Accordingly, we need not consider whether the decisions to terminate her and not transfer her to the transcription position were pretextual because we are granting Fox Chase's motion for summary judgment as to Barley's retaliation claim.

3.     Whether Barley's State-Law Claims Survive

Fox Chase contends that we should dismiss Barley's PHRA discrimination and retaliation claims because "[t] he PHRA is basically the same as the ADA in relevant respects and Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts." Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002) (internal citation and alteration omitted).  Barley did not oppose this aspect of Fox Chase's motion.  Accordingly, because we find that Barley has failed to make a prima facie retaliation case, we will also dismiss her state-law based retaliation claim.

**IV.     Conclusion**

For the reasons stated above, we will deny Barley's motion for summary judgment and grant Fox Chase's motion for summary judgment as to her ADA claims and PHRA claims.

BY THE COURT:

/S/ STEWART DALZELL, J.

30